**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Sanaa El Musselmani, | No. CV-22-0464-TUC-EJM |
| Plaintiff, | |
| v. | **ORDER** |
| Martin O'Malley,[1] Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff Sanaa El Musselmani's Opening Brief (Doc. 16).  Defendant filed his Answering Brief ("Response") (Doc. 20), and Plaintiff replied ("Reply") (Doc. 21).  Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Compl. (Doc. 1).

Based upon the parties' pleadings and the administrative record submitted to the Court, undersigned REVERSES and REMANDS the Commissioner's decision for further consideration.

. . .

. . .

. . .

---

[1] The Court takes judicial notice that Kilolo Kijakazi is no longer Acting Commissioner of the Social Security Administration ("SSA").  The Court will substitute the new Commissioner of the SSA, Martin O'Malley, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See also* Fed. R. App. P. 43(c)(2).

## I.    BACKGROUND

### A.    Procedural History

On May 6, 2020, Plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of January 1, 2020, due to back pain, epilepsy, and high cholesterol.  *See* Administrative Record ("AR") at 13–15, 20, 64, 66, 84, 86–87, 96–98, 113, 115, 205, 215, 239, 242, 267, 277.[2]  The Social Security Administration ("SSA") denied this application on July 21, 2020.  *Id.* at 13, 84–95, 115–18.  On September 1, 2020, Plaintiff filed a request for reconsideration, and on March 9, 2021, SSA denied Plaintiff's application upon reconsideration.[3]  *See id.* at 13, 96–113, 119–22, 131–33.  On March 24, 2021, Plaintiff filed her request for hearing.  *Id.* at 13, 135.  On September 20, 2021, a telephonic hearing was held before Administrative Law Judge ("ALJ") Peter Baum.  *Id.* at 13, 62–83.  On September 30, 2021, the ALJ issued an unfavorable decision.  *Id.* at 10–21.  On November 29, 2021, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on September 15, 2022, review was denied.  *Id.* at 1–6, 202–204.  On October 5, 2022, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.    Factual History

Plaintiff was fifty-six (56) years old at the time of the alleged onset of her disability and fifty-eight (58) years old at the time of the administrative hearing.  *See* AR at 13, 19, 64, 79–80, 84, 86–87, 96–98, 113, 191, 205, 215, 239, 242, 267, 277.  Plaintiff finished high school.  *Id.* at 19, 66, 80, 84, 113, 243.  Plaintiff has not worked prior to her alleged disability.  *See id.* at 227–38, 259, 266.

. . .

. . .

---

[2] Page numbers refer to the page numbers demarcated in the Administrative Record rather than the Court's Case Management/Electronic Case Files ("CM/ECF") page numbers.

[3] The ALJ's decision lists March 8, 2021 as the date of denial upon reconsideration; however, the letters are dated March 9, 2021.  *Compare* AR at 13, *with* AR 131.  The Court presumes that the ALJ's date was merely a typographical error.

**1.** **Plaintiff's Testimony**

**a.** **Administrative Hearing**

At the outset of the hearing, Plaintiff's counsel noted that Plaintiff's native language is Lebanese Arabic.  AR at 65–66.  Plaintiff confirmed that she had graduated from high school, but did not attend university.  *Id.* at 66.  Plaintiff reported that she had not worked since she had filed for disability benefits on May 6, 2020.  *Id.* at 66–67.  Plaintiff testified that she is living in her sister's home and recently began receiving nutrition assistance.  *Id.* at 67.  Plaintiff reported that she does not drive.  *Id.* at 67–68.  Plaintiff testified that she calls the Banner shuttle for transportation to and from her medical appointments, and sometimes a family member drives her.  AR at 68.

Plaintiff confirmed that she suffered a compression fracture in her back from a car accident.  *Id.* at 69.  Plaintiff reported that the accident also resulted in a broken pelvis and a rod being placed in her left leg.  *Id.* at 69–70.  Plaintiff noted that she also hit her shoulder.  *Id.* at 69.  Plaintiff described having trouble walking and standing.  *Id.*  Plaintiff testified that she has received physical therapy for her hip, lumbar, and shoulder/arm.  AR at 69–70.  Plaintiff estimated that the most she could carry would be one gallon of milk.  *Id.* at 71–72.  Plaintiff denied being able to pick up or carry a case of water.  *Id.* at 72.

Plaintiff acknowledged seeing Dr. Barlow for an examination, but could not remember much about what they discussed.  *Id.* at 72–74.  Plaintiff indicated that she did not remember hopping on one foot or lifting anything with Dr. Barlow.  *Id.* at 73.  Plaintiff testified that she does not remember anything when she has a focal seizure.  AR at 74.  Plaintiff described having a seizure while eating lunch with her mother—she remembers eating lunch, but the next thing she remembers in being in her bed.  *Id.* at 74–75.  Plaintiff noted that her mother knows to follow her because Plaintiff's seizures are not obvious.  *Id.* at 75.  Plaintiff reported that the number of seizures she has varies from month to month, and sometimes they happen twice a day, but estimated they occur between at least six (6) and ten (10) times per month, with some months as high as twenty (20).  *Id.* at 75–76.  Plaintiff noted that following a long seizure, she has a headache and requires sleep.  *Id.* at

75.  Plaintiff reported that her doctor discussed putting some sort of implant in her, but that although it would reduce the severity of her seizures, they would still occur.  AR at 76.  Plaintiff further reported that the doctor said that the surgery would cause her to lose her memory and require her to learn everything all over again.  *Id.*  Plaintiff testified that she has been to the Emergency Department and underwent an Electroencephalogram ("EEG") and Magnetic Resonance Imaging ("MRI").  *Id.* at 77.  At the time of the hearing, COVID-19 was impacting hospital stays and testing.  *Id.*  Plaintiff further testified that her seizures came without warning and did not seem to be brought on by anything specific.  *Id.*

Plaintiff reported difficulty staying asleep, despite medication, which results in some daytime fatigue necessitating naps once or twice per week, on average.  AR at 77–78.  Plaintiff also noted that she has psoriasis, eczema, and a fungal infection, all of which require medication.  *Id.* at 78–79.  Plaintiff indicated that she had asked her neurologist about the medications that she has been prescribed, but his response was unclear.  *Id.*

### b.  Administrative Forms

#### i.  *Seizure Questionnaire—Third Party*

On June 19, 2020, Plaintiff completed a Seizure Questionnaire to Third Party.[4]  AR at 254–55.  Plaintiff reported that her seizures were witnessed by her parents, siblings, and friends, and noted that she has had seizures for many years but her description was focused on those that had occurred on April and May 2020.  *Id.* at 254.  Plaintiff outlined the dates and descriptions of her seizure events, as follows:

April 6, 2020 = I lost my consciousness for 6 minutes.

April 9, 2020 = I felt but I didn't loose [sic] my consciousness

April 14, 2020 = I was sleeping and waking up from my bed without knowing what I am doing.  After returning back to my consciousness went back to bed.

April 15, 2020 = I had a seizure without feeling previously.  I lost consciousness for a 5 minutes and after it I slept for all day with bad headache.

April 16, 2020 = I had a seizure and I lost my consciousness for 6

---

[4] It is unclear why Plaintiff completed this form given its direction to a third party.

minutes.

        May 5, 2020 = I had a seizure without feeling previously.  I lost my consciousness for minutes.

        May 12, 2020 = I had a seizure without feeling previously I lost my consciousness and after 3 hours I got another one.

        May 25, 2020 = I didn't feel previously with any sign I had a seizure & lost my consciousness & I kept sleeping all day with bad headache.  I woke up next day with headache.

*Id.* at 255.  Plaintiff estimated that she has between four (4) and five (5) seizures per month.  *Id.* at 254.  Plaintiff indicated that sometimes she feels that she is going have a seizure, but sometimes they come on without warning.  *Id.*  Plaintiff estimated that she witnesses a seizure around three (3) times per month, with her most recent on June 8, 2020.  AR at 254.

    Plaintiff confirmed that she loses consciousness for approximately five (5) to ten (10) minutes during a typical seizure.  *Id.*  Plaintiff indicated that she experiences jerking and thrashing movements, and described her body movements, as follows:

My seizure was witnessed by my sister and parents while I am awake I get so irritable then I will have seizure, lose my conscious and I will not be able to see or hear.  Could be walking and doing stuff without knowing what I am doing.  Sometimes I rubbed my hand and stare not aware of what is happening with me.

*Id.* at 254–55.  Plaintiff reported that sometimes there would be warning signs prior to a seizure, but other times they would come without warning.  *Id.* at 254.  Plaintiff noted that warnings usually include her "heart beat[ing] fast and [she] feel[s] scared that [she] [is] going to have a seizure."  *Id.* at 255.

    Plaintiff denied biting her tongue or losing bladder or bowel control during a seizure.  AR at 254.  Plaintiff confirmed that she had been injured while seizing, explaining:

I took several medications at once without remembering that I took them.  I was hospitalized for that.  I fell off the ladder while I had seizure.  I was hospitalized for that which led for back and leg injury.  Also, I felt while I was walking during having seizure and without knowing I found myself on the floor with my hand and knee bleeding.

*Id.* at 254–55.  Plaintiff described experiencing severe headaches following a seizure, noting they can last up to two (2) days, and also indicated that she feels sleepy afterward, which can result in her sleeping all day.  *Id*. at 254.

### ii. *Exertional Daily Activities Questionnaire*

On June 19, 2020, Plaintiff completed an Exertional Daily Activities Questionnaire. AR at 256–58.  Plaintiff reported that she lived in a house with family.  *Id.* at 256.  Plaintiff described her average day to include "stay[ing] home most of the day[,] . . . [and] prepar[ing] meals for [her]self if [she] [is] able to do it."  *Id.*  Plaintiff further described the limitations of her medical conditions as follows:

> My back hurts most of the time, the pain is extended to both legs which prevent me from cleaning, lifting and walking for short distance.  I was treated by physical therapy but due to Covid-19 it was placed on hold now. My physician (Dr. Sheela Bhat) is going to order new request for physical therapy treatment.

*Id.*  Plaintiff indicated that she can walk for approximately one-half mile when she is not having pain, and estimated that it takes her thirty (30) to forty (40) minutes.  *Id.*  Plaintiff also estimated that she can lift four (4) pounds, if she does not have pain, and can do so twice per day.  AR at 258.

Plaintiff denied doing her own grocery shopping.  *Id.*  Plaintiff reported that she cleans her bedroom, does her laundry, and dusts for a total of four (4) hours.  *Id.*  Plaintiff noted that she has difficulty finishing chores, because if she stands for thirty (30) minutes, she has to stop and rest due to back pain.  *Id.*  Plaintiff denied driving because of her epilepsy.  *Id.*  Plaintiff indicated that her epilepsy also prevents her from participating in outdoor activities, such as swimming or hiking, because she needs someone to be with her. AR at 258.  Plaintiff confirmed that she does walk around the house three (3) times per week.  *Id.*  Plaintiff reported that she performed these chores prior to the onset of her alleged conditions, and noted that she has had to reduce her walking to once per week due to her back and leg pain.  *Id.*

Plaintiff reported sleeping for seven (7) hours, rests three (3) times per day, and naps

for approximately one (1) hour per day.  *Id.*  Plaintiff listed her medications to include Aleve and MoveFree Joint Health Advanced (Glucosamine and Chondroitin).  *Id.* at 257. Plaintiff also noted that she does physical therapy exercises once per day.  AR at 257. Plaintiff indicated that she wears glasses for a vision impairment and glaucoma, as well as a brace for her back pain.  *Id.*  In response to whether there was anything else Plaintiff wanted to tell the Administration about her condition, she stated:

> I do have Epilepsy in addition to my back and legs pain that will limit any activity to drive, swim and do other exercise by myself, the medications that I take for epilepsy such as (Keppra) which makes me fatigue and drowsy and have deficit in cognition.  In addition, I have been taking (tegretol-XR) for long time to control my seizure activities which cause as well dizziness and joint pain.  A year ago, my neurologist has add new drug called (Onfi) for my seizure which cause me to be tired and sleepy.

*Id.*

### iii. Work History Report

On June 19, 2020, Plaintiff completed a Work History Report, and reported that she did not have a prior work history.  AR at 259–66.  Plaintiff added the following comments in the "Remarks" section of the form:

> I wasn't able to work because of my seizure disorder "Epilepsy", I had it for more than 15 years.  I am taking several medications to control my seizures with no success.  My seizures sometimes come without warning and I lose my conscious and don't recall what I am doing during seizure, I don't hear and I can't see.  I do stuff without knowing what I am doing and don't follow command until the seizures is gone which can last 5 to 10 minutes. Following the seizure I get severe headache which can last up to 2 days and need to sleep.

*Id.* at 266.

### 2.  <u>Vocational Expert Gloria Lasoff's Testimony</u>

Ms. Lasoff testified as a vocational expert at the administrative hearing.  AR at 13, 79–82, 191–93, 305.  The ALJ noted that Plaintiff had no past relevant work, so the discussion would be limited to the possibility of unskilled work.  *Id.* at 79.  The ALJ asked Ms. Lasoff to consider a hypothetical individual of Plaintiff's age—57 at the time of filing

and 58 at the time of the hearing, education, and past relevant work; who was without exertional, manipulative, visual, or communicative limitations; could occasionally climb ramps and stairs; could never climb ladders, ropes, and scaffolds; could frequently balance, stoop, kneel, and crouch; could occasionally crawl; should avoid concentrated exposure to extreme cold, to extreme heat, to wetness, to humidity, to noise, to vibration, and to airborne irritants; and should avoid even moderate exposure to hazardous machinery or unprotected heights.  *Id.* at 79–80.  The ALJ enquired about the existence of jobs at the medium level of exertion that Plaintiff could sustain.  *Id.* at 80.  Ms. Lasoff confirmed the availability of qualifying jobs.  *Id.*

Ms. Lasoff opined that such an individual would be employable as a hand packager, Dictionary of Occupational Titles ("DOT") number 920.587-018, with a Specific Vocational Preparation ("SVP") of 2, medium exertional level, and of which there are approximately 78,000 positions in the national economy.  AR at 80.  Ms. Lasoff further opined that such an individual would also be able to work as a conveyor feeder, DOT number 921.686-014, medium exertional level, with an SVP of 2, and approximately 25,000 positions in the national economy.  *Id.*  Ms. Lasoff also opined that such an individual would be employable as a kitchen helper, DOT number 318.687-010, medium exertional level, with an SVP of 2, and of which there are approximately 148,000 jobs in the national economy.  *Id.*

The ALJ further enquired regarding the hypothetical individual, but who was having "absent spells" for ten (10) to fifteen (15) minutes at a time, occurring between six (6) and twenty (20) times per month, occurring without warning, and leaving Plaintiff with very little or without recollection of what happened to her.  *Id.* at 81.  Ms. Lasoff opined that there would not be any sustainable jobs in a competitive labor market available to such an individual.  *Id.*  The ALJ confirmed that the original hypothetical individual, who is also limited in her ability to be on her feet standing or walking for fifteen (15) minutes at a time and could reliably lift no more than a gallon of milk, would not be able to sustain light work, which given her age would eliminate any possible employment for Social Security

Disability purposes.  AR at 81–82.

### 3.  Plaintiff's Medical Records

#### a.  Treatment records

On August 16, 2017, Plaintiff was seen by David M. Labiner, M.D., who reported evaluating Plaintiff with Dr. Sim.  AR at 312; *see also* AR at 378–80.  Dr. Sim indicated that Plaintiff reported having had seizures on July 12, July 14, July 28, August 11, and August 16, 2017.  AR at 378.  Dr. Sim's review of Plaintiff's systems and physical examination were unremarkable.  *Id.* at 380.  Dr. Sim noted Plaintiff's baseline as "one seizure a week or so."  *Id.*  Dr. Labiner noted that they "discussed an evaluation for surgical intervention either ablative or a devices [sic] but [Plaintiff] declined to pursue at this time." *Id*. at 312.  Plaintiff reported that "she ha[d] gained considerable weight on Lyrica[,]" which prompted Dr. Labiner and Dr. Sim to move to replace it with Onfi.  *Id.* at 312, 378.

On November 21, 2017, Plaintiff was discharged following a fall from a ladder of approximately ten (10) feet.  AR at 381–82.  Records reflect that Plaintiff suffered a "[l]oss of consciousness and then seizure-like activity after [the] fall."  *Id.* at 381.  Upon EMS arrival, Plaintiff "was found alert and oriented however was having jerking motions."  *Id.* Subsequent "[x]rays were negative for acute fractures/dislocations."  *Id.*

On April 3, 2018, Plaintiff returned to Dr. Labiner and Dr. Sim.  *Id.* at 383–86. Records indicate that Dr. Siegal discontinued Lyrica and began Plaintiff on Onfi.  AR at 384.  Plaintiff reported "a day [in] late February when she felt like she was going to again have a seizure, but she did not end up having one[,] . . . [and] [s]ince that day she has not had any episodes."  *Id.*  Dr. Sim's review of Plaintiff's systems and physical examination were unremarkable.  *Id.* at 385.  Dr. Sim's assessment included localization related epilepsy.  *Id.*

On September 11, 2018, Plaintiff was evaluated by Dr. Labiner and Urooba Faheem, M.D.  *Id.* at 387–90.  Plaintiff reported that on May 25, 2018, "she lost consciousness without any warning for seconds with no full body shaking[,] . . . [and] felt tired and had a horrible headache for the next 24 hours for which she took an Advil."  AR at 387.

1   Treatment records further reflect that "[a]gain on 06/23/18, she lost consciousness again

2   momentarily without any premonition[;] [h]er mother mentioned that she was talking to

3   her parents during the seizure which is new and she has no recollection of this." *Id.* "Post

4   ictal phase lasted for about 12-24 hours with headache and fatigue." *Id.* Plaintiff also

5   reported "[m]ultiple times in July when she had lapses in consciousness[,]" but no seizures

6   were reported in August and September. *Id.* Plaintiff indicated that "[s]he continues to

7   have left sided hip and knee pain since [her] fall [from the ladder]." *Id*. at 387. Dr.

8   Faheem's review of Plaintiff's systems was unremarkable except for numbness in her right

9   upper extremity in the lateral three (3) fingers. *Id.* at 388. Dr. Faheem's physical

10  examination was also generally unremarkable. AR at 388–89. Dr. Faheem's impressions

11  included localization related epilepsy and Carpal Tunnel Syndrome. *Id.* at 390.

12          On March 21, 2019, Plaintiff returned to Dr. Labiner for a follow-up. *Id.* at 391–

13  93. Treatment records noted that "[s]ince her last visit, she has had multiple lapses in

14  consciousness – once on Nov 14, once on Mar 2, and once on Mar 12." *Id.* at 391. Plaintiff

15  "also state[d] that there have been multiple times where she will suddenly find herself

16  standing and she is not aware of how she got there or what she was doing." *Id.* Records

17  further indicate that "[h]er family has told her she also has staring episodes where they

18  cannot get her to respond." AR at 391. Dr. Labiner's review of Plaintiff's systems and

19  physical examination were generally unremarkable. *Id.* at 391–93. Dr. Labiner adjusted

20  Plaintiff's medication dosages. *Id.* at 393.

21          On May 7, 2019, Plaintiff was seen by Sheela Bhat, M.D., her primary care

22  physician, for her annual physical. *Id.* at 459–63. Dr. Bhat's review of Plaintiff's systems

23  and physical examination were unremarkable. *Id.* at 460–61.

24          On June 6, 2019, Plaintiff saw David Gooch, DPM regarding a nail fungus on her

25  left hallux nail. AR at 348–49, 475. On June 20, 2019, Plaintiff followed up with Ryan

26  Teeple, M.D. at Southern Arizona Ophthalmology regarding her glaucoma. *Id.* at 411–13.

27  Dr. Teeple's examination was generally unremarkable. *See id.*

28          On August 20, 2019, Plaintiff returned to Dr. Teeple regarding her glaucoma. *Id.*

1    at 414–15.  Treatment records reflect that Plaintiff "did not start Cosopt after last visit as
2    we had planned."  *Id.* at 415.

3        On October 1, 2019, Plaintiff followed-up with Dr. Labiner.  AR at 394–95, 407–
4    408.  Plaintiff reported two (2) seizure since her prior visit in March 2019—one (1) in July
5    and one (1) in August.  *Id.* at 394, 407.  Plaintiff reported a trembling feeling prior to both
6    seizures, that she lost a large period of time with both seizures, and experiencing a headache
7    afterward that lasted the rest of the day.  *Id.*  Dr. Labiner's examination was unremarkable.
8    *Id.* at 395, 407.  On October 21, 2019, Plaintiff followed up with Dr. Teeple regarding her
9    glaucoma.  *Id.* at 416–18.  Treatment records reflect that Plaintiff began using Cosopt and
10   despite "some burning when instilling[,]" she was tolerating it well.  AR at 416.

11       On November 7, 2019, Plaintiff returned to Dr. Bhat for a routine follow-up.  *Id.* at
12   455–58.  Dr. Bhat's review of Plaintiff's systems was unremarkable, as was her physical
13   examination.  *Id.* at 456–57.

14       On December 19, 2019, Plaintiff had radiographs of her pelvis and left hip.  *Id.* at
15   474.  Edward Woolsey, M.D. noted the "[m]edullary rod left femur bridging an old
16   proximal femoral fracture[,]" without more.  *Id.*  On December 27, 2019, Plaintiff was seen
17   by Mayer Horensten, D.O. regarding left hip and leg pain.  AR at 452–54.  Dr. Horensten
18   noted somewhat diminished deep tendon reflexes in her lower extremities, but "had good
19   range of motion to both hips without any pain[,] [although] there was some tenderness over
20   the bursa of the left greater trochanter[,] [and] there was no palpatory tenderness over the
21   sciatic area."  *Id.* at 452.  Dr. Horensten also noted that "the x-ray report of [Plaintiff's] left
22   hip . . . showed the medullary rod in good position."  *Id.*

23       On January 10, 2020, Plaintiff had radiographs of her lumbar spine.  *Id.* at 473.
24   Donald Mar, M.D. reviewed Plaintiff's films and noted "[s]table L1 compression[] [and]
25   [d]egenerative lumbar spondylosis."  *Id.*  On January 27, 2020, Plaintiff was seen at
26   BodyCentral Physical Therapy regarding her low back pain and left sided knee pain which
27   developed after her regular gym class.  AR at 329–32, 466–72.  Plaintiff reported
28   significant pain, not controlled by over the counter medication, as well as difficulty

performing daily activities due to pain. *Id.* at 329, 331, 466, 469. Treatment records reflect that Plaintiff "demonstrate[d] pelvic obliquity and referred pain patterns from glutes and L[eft] SIJ [(sacroiliac joint)] that may significantly limit her ability to perform functional mobility and participate in recreation." *Id.* Records further reflect that Plaintiff's last seizure was fifteen (15) days prior. *Id.* at 331, 466. On January 30, 2020, Plaintiff returned to BodyCentral Physical Therapy for treatment. *Id.* at 327–28. Plaintiff reported "having pain in L[eft] hip going down thigh to just above knee[,] . . . [and] sometimes she has pain on R[ight] side as well." AR at 327. Treatment records note that Plaintiff "had good tolerance with activities today[,]" and "had good form and technique[.]" *Id.* Plaintiff reported increased symptoms in her hips and low back with standing hip abduction and extension. *Id.*

On February 5, 2020, Plaintiff was again seen at BodyCentral Physical Therapy. *Id.* at 325–26. Plaintiff reported pain in her right hip "since last session after doing standing hip abd[uction] exercises." *Id.* at 325. Treatment records reflect "elevated tension in R[ight] glute/piriformis musculature." AR at 325. Records further reflect Plaintiff "had good tolerance with activities[,]" and was able to complete TRX squats and side stepping without increased pain or other issues. *Id.* On February 7, 2020, Plaintiff returned for further physical therapy. *Id.* at 323–24. Plaintiff reported decreased right hip pain. *Id.* at 323. Treatment records reflect that Plaintiff "presented with improved muscular tension in glute/piriformis musculature as compared to prior session." *Id.* Records also reflect the addition of resistance bands to side stepping which Plaintiff tolerated. *Id.* On February 11, 2020, Plaintiff was seen for physical therapy and reported "improved L[eft] low back pain yet increased R[ight] groin pain." AR at 321. Treatment records indicate that Plaintiff "demonstrate[d] improved pelvic obliquity[,] . . . [and] significant sensitivity/tenderness in L[eft] hip musculature at this time." *Id.* On February 13, 2020, Plaintiff returned to physical therapy and "report[ed] feeling very sore . . . in low back and R[ight] groin." *Id.* at 319. Treatment records note that she "was very tender with manual today and only tolerated lighter pressure as compared to previous sessions." *Id.* On February 18, 2020,

Plaintiff was seen for a physical therapy appointment and "report[ed] increased low back pain although she didn't do much over the weekend." *Id.* at 317. Treatment records reflect continued "poor pelvic stabilization." AR at 317. On February 20, 2020, Plaintiff had another physical therapy appointment and "report[ed] that the side and backs of her legs [we]re hurting[,]" and "that she went for a walk and started to feel some soreness afterwards." *Id.* at 315. Treatment records note that Plaintiff "had good tolerance with activities[,] . . . was tender in L[eft] IT [(iliotibial)] band[,] . . . [and] had improved pelvic alignment following pelvic distraction." *Id.*

On March 1, 2020, Plaintiff was seen at the Emergency Department of Carondelet Health Network. *Id.* at 357–66. Plaintiff was discharged on March 2, 2020. *Id.* at 367–68. Treatment records reflect Plaintiff "came in . . . after a seizure and accidental drug overdose." AR at 357. Records indicate that "[j]ust prior to arrival [Plaintiff] had a seizure[,] . . . [and] [w]hen she is postictal she tends to pick at things[,] . . . when she finally came around noticed that her bottle of Onfi was empty." *Id.* at 357, 362. Plaintiff did "not remember how many tablets were left in the bottle." *Id.* at 357. Review of Plaintiff's systems reflect that she suffered dizziness and an altered level of consciousness, but otherwise unremarkable. *Id.* Physical examination of Plaintiff was similarly unremarkable. *Id.* at 358–59. Records further reflect Plaintiff's EKG showed nonspecific T wave abnormalities. *See* AR at 359, 365, 370. Plaintiff was admitted overnight for observation due to the medication's long half-life. *Id.* at 361; *see also* AR at 365–66. Plaintiff underwent a CT scan without contrast. AR at 365, 376, 396. David Jeck, M.D. reviewed the same and did not find any significant intracranial abnormality. *Id.* at 376, 396. Additionally, while Plaintiff was hospitalized, Michael Epstein, M.D. evaluated her and recorded her history as follows:

> Th[is] is a nearly 57-year-old right-handed woman of Lebanese descent who developed seizures at the time of her menarche. Initially she described tonic-clonic activity long postictal fatigue lasting a day or more, but over time she evolved to partial seizures. She might have a prodrome of the headache and aura of rapid heartbeat or fear or anxiety followed by a fugue-like state during which she might perform random obviously worthless

> activities.  And [sic] auxiliary historian was with her and said that she could tell when her patient went into a seizure, but there are no clear-cut automatisms, adversive reactions or autonomic changes.  Spells [e]nd quickly and postictal confusion is very brief.  Frequency is variable and she listed gaps of 1, 2 or 3 weeks but it seems she rarely goes a full month without seizures.
>
> She is followed by a sophisticated subspecialist/epileptologist, Dr. Labiner, and she has had numerous medication changes over time.  She had one that affected her vision, possibly vigabatrin but she remembers many medications and they run together, somewhat understandably.  She was offered evaluation for epilepsy surgery but rejected it based on the possibility of memory changes or other complications.

*Id.* at 367.  Plaintiff's discharge summary indicates that Plaintiff took the rest of her Clobazam prescription, not Onfi as reflected in the Emergency Department records. *Compare* AR at 397, *with* AR at 357.

On May 28, 2020, Plaintiff saw Dr. Labiner and Sanchari Datta, M.D. for a follow-up.  AR at 399–401, 403–404.  Treatment records indicate that Plaintiff reported "multiple seizures with loss of consciousness, anywhere from 1–4 seizures a month[,]" since the previous November.  *Id.* at 399, 403.  Plaintiff further reported additional "episodes where she would [feel] a seizure coming on and maybe have a headache but not lose consciousness."  *Id.*  Plaintiff reported increased anxiety, as well as daily headaches.  *Id.* at 400, 403.  Plaintiff's sister attended the appointment via telephone and state[d] that Plaintiff "has been extremely irritable which is very unlike her usual self."  *Id.* at 399–400, 403. Records indicate that Plaintiff's "sister is very guarded about patient's low sodium level and mentions that her memory has been getting worse as well[,] [and] . . . is extremely concerned that her sister is getting worse."  AR at 400, 403.  Dr. Datta's review of Plaintiff's systems and physical examination were unremarkable.  *Id.* at 400, 404.  Dr. Labiner adjusted Plaintiff's medications.  *Id.*

On June 4, 2020, Plaintiff returned to Dr. Teeple for a follow-up regarding her glaucoma.  *Id.* at 419–23, 429–31.  Plaintiff underwent Optical Coherence Tomography ("OCT"), as well as Optic Nerve Tomography.  *Id.* at 419–20, 429–30.  Dr. Teeple's

findings included nerve fiber layer loss, but this was stable compared to previous studies. AR at 420, 430.  Dr. Teeple's also reviewed Plaintiff's interocular pressure ("IOP") results. *Id.* at 419, 429.  On June 9, 2020, Plaintiff was seen by Sheela Bhat, M.D. for her annual physical.  *Id.* at 447–51.  Plaintiff reported having had "several seizures" and neurology increased her Onfi dosage.  *Id.* at 448.  Dr. Bhat's review of Plaintiff's systems was unremarkable, as was her physical examination.  *Id.* at 448–49.  Dr. Bhat's assessment included mixed hyperlipidemia, prediabetes, absences seizures, glaucoma, and obesity. AR at 447.

On November 30, 2020, Plaintiff was seen by Ayesha Javed, M.D. to establish care. *Id.* at 593–95.  Dr. Javed's review of Plaintiff's systems was unremarkable, except for lesions on her right elbow and big toe which were being treated by dermatology.  *Id.* at 594.  Dr. Javed's physical examination of Plaintiff was similarly unremarkable, and she further observed that no specific lesion was noted on Plaintiff's elbow.  *Id.*

On December 17, 2020, Plaintiff was seen by Mannix Consolacion, NP-C regarding psoriasis and nail fungus.  *Id.* at 540–45.  NP Consolacion's examination was generally unremarkable.  AR at 540.

On January 14, 2021, Plaintiff returned to NP Consolacion for a follow-up.  *Id.* at 546–51.  Aside from Plaintiff's ongoing psoriasis and nail fungus, NP Consolacion's examination was generally unremarkable.  *Id.* at 546.  NP Consolacion also performed punch two (2) punch biopsies of Guttate papules, one (1) on Plaintiff's right posterior upper arm and one (1) on her right superior medial midback.  *Id.* at 547.  On January 25, 2021, Plaintiff saw Dr. Teeple for a follow-up regarding her glaucoma.  *Id.* at 574–76.  Dr. Teeple's examination was generally unremarkable.  *See* AR at 574–76.

On February 2, 2021, Plaintiff followed up with NP Consolacion.  *Id.* at 552–57. NP Consolacion's examination of Plaintiff was generally unremarkable.  *Id.* at 552. Treatment records indicate that Plaintiff had "[e]rythematous papules distributed on the right posterior upper arm, left posterior upper arm, right thigh, and left thigh."  *Id.* at 552. These were assessed as spongiotic dermatitis.  *Id.*  Plaintiff's nail fungus remained

1    unchanged, and NP Consolacion noted Plaintiff suffered from inadequately controlled dry

2    skin.  AR at 553.

3        On March 8, 2021, Plaintiff underwent a routine mammogram.  *Id.* at 592.  Danielle

4    Carroll, M.D. found no significant change from prior films.  *Id.*

5        On May 3, 2021, Plaintiff again returned to NP Consolacion.  *Id.* at 558–64.  NP

6    Consolacion's examination of Plaintiff was generally unremarkable.  *Id.* at 558.  Records

7    reflect that Plaintiff's spongiotic dermatitis was confirmed by the biopsies.  AR at 558–59.

8        On June 2, 2021, Plaintiff returned to Dr. Javed for a follow-up.  *Id.* at 585–88.  Dr.

9    Javed's review of Plaintiff's systems was positive for skin itching and rash, but was

10   otherwise unremarkable.  *Id.* at 589.  Physical examination was similarly unremarkable.

11   *Id.* at 590.  Dr. Javed noted that Plaintiff's psoriasis was being followed by dermatology,

12   and her epilepsy was well-controlled and followed by neurology.  *Id.* at 590.

13       On July 26, 2021, Plaintiff returned to Dr. Teeple for a follow-up regarding her

14   glaucoma.  AR at 577–84.  Dr. Teeple's examination was generally unremarkable and

15   indicated that Plaintiff's conditions remained stable.  *See id.* at 577–80.

16       **b.  Consultative Examiner Robert B. Barlow, M.D.**

17       On January 23, 2021, Robert B. Barlow, M.D. examined Plaintiff at the request of

18   the Arizona Department of Economic Security ("AZDES").  AR at 516–26.  Dr. Barlow

19   observed that Plaintiff "seem[ed] to be a reliable historian[,]" and reviewed Plaintiff's

20   history of back pain, epilepsy, and high cholesterol.  *Id.* at 517, 524.  Dr. Barlow listed

21   Plaintiff's medication to include keppra, Onfi, dorzolamide HCL, atorvastatin, meloxicam,

22   alendronate, Tegretol, and latanoprost/timolol maleate.  *Id.* at 518.  Dr. Barlow's review of

23   Plaintiff's systems was unremarkable.  *Id.* at 519.  Dr. Barlow's physical examination was

24   also generally unremarkable.  *Id.* at 519–23.  Dr. Barlow reported that his clinical

25   examination found that Plaintiff "ha[d] no significant abnormalities."  AR at 524.  Dr.

26   Barlow concluded that Plaintiff showed "no overt evidence of acute or chronic physical

27   illness and [her] mental status was otherwise stable today."  *Id.*

28       Dr. Barlow noted that "[w]hen asked about her [back] pain, [Plaintiff] said it was

7/10 in her lower back and right hip at the beginning of the exam, and 8/10 at the end." *Id.* Dr. Barlow opined that Plaintiff "was able to perform all of the requested maneuvers without difficulty . . . [and] was in no acute distress." *Id.* Dr. Barlow observed that Plaintiff "has had uncontrolled epilepsy for more than 20 years and has seen a physician for this condition." *Id.* Dr. Barlow described Plaintiff's symptoms to "include having sudden multiple seizures, loss of consciousness, and loss of memory[,] [with] [h]er most recent seizure [occurring] last week." AR at 524. Dr. Barlow also noted Plaintiff's history of high cholesterol, which was being treated with medication. *Id.* Dr. Barlow opined that Plaintiff did not have any limitations in her ability to sit, stand, walk, lift, carry, bend, squat, reach, handle, feel, grasp, see, and communicate. *Id.* at 524–25. Dr. Barlow further opined that Plaintiff did not have any environmental limitations. *Id.* at 525.

Dr. Barlow also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). *Id.* at 527–30. Dr. Barlow found "no significant abnormalities." AR at 527. Dr. Barlow left the remainder of the form blank. *Id.* at 527–30.

### c.  Reviewing physicians

#### i.      D. Mirza, M.D.

On July 20, 2020, Dr. Mirza performed an initial review Plaintiff's medical records. AR at 86–95. Dr. Mirza considered Plaintiff's impairments to include epilepsy and other and unspecified arthropathies. *Id.* at 91. Dr. Mirza required seizure precautions in Plaintiff's residual functional capacity. *Id.* at 92, 94.

#### ii.      C. Combs, M.D.

On February 10, 2021, Dr. Combs performed a review of Plaintiff's medical records upon reconsideration. AR at 96–112. Dr. Combs's findings were consistent with Dr. Mirza's initial assessment. *See id.*

## II.      STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are

based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  "Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (citations omitted) (alterations in original).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.   ANALYSIS

### A.   The Five-Step Evaluation

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. §

404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. § 404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is not disabled.  Step Four considers the claimant's residual functional capacity and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work, then he or she is not disabled.  Step Five assesses the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  *Id.*

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of May 6, 2020.  AR at 15.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairment: epilepsy (20 CFR 416.920(c))."  *Id.*  At step three, the ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)."  *Id.* at 16.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; and occasionally crawl[;] [s]he has no manipulative, visual, or communication limitations[;] . . . should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibrations, and airborne irritants[;] . . . [and] should avoid even moderate exposure to hazardous machinery and unprotected heights."  *Id.* at 17–18.  At step four, the ALJ found that "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968)."  *Id.* at 19.  At

step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a)." AR at 19.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 20.

### B.    *Plaintiff's Symptom Testimony*

Plaintiff asserts that the ALJ failed to "articulate clear and convincing reasons to disregard symptom testimony[.]"  Opening Br. (Doc. 16) at 8–10.  Defendant argues that "[s]ubstantial evidence supported the ALJ's finding that inconsistencies between Plaintiff's statements to treatment providers and her allegations to the SSA undermined her symptom testimony."  Response (Doc. 20) at 9.  The Court agrees with Plaintiff.

### 1.  Legal Standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of h[is] symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v.*

*Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. Analysis

The ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony.  AR at 18.  Next, the ALJ acknowledged Plaintiff's assertion in her Disability Report that "she is unable to work due to back pain, epilepsy, and high cholesterol[.]"  *Id.* (citations omitted).  The ALJ then concluded "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  *Id.*  The ALJ considered Plaintiff's allegations, responses to administrative inquiry, and medical records.  *See id.* at 18–19.

In discounting Plaintiff's symptom testimony, the ALJ observed that regarding Plaintiff's "allegation of the frequency of seizures that have escalated, since the protective filing date," he could "not find consistent evidence of the frequency, intensity, or duration of these alleged spells to include her prior statements to her doctors and to the Social Security Administration.  *Id.* at 18.  The ALJ continued, "[f]or example, the claimant testified that she has 6–20 dyscognitive/absence spells a month, averaging about 10 or more per month, and lasting 10–15 minutes at a time."  AR at 18.  The ALJ did not acknowledge that Plaintiff also testified that "[l]ike a month, sometimes like it happens like seizure happen to me two times like same day[,] [a]nd sometimes one . . . each month is different than the other."  *Id.* at 75.  It is unclear from Plaintiff's hearing testimony whether she was including multiple seizures in a single day in her total count, or whether she was referring to the number of days in a month that seizures occurred, or if she made some other

calculation to arrive at her estimate.  Further, March 21, 2019 treatment records from Dr. Labiner noted that "[s]ince her last visit, she has had multiple lapses in consciousness – once on Nov 14, once on Mar 2, and once on Mar 12."  *Id.* at 391.  Plaintiff "also state[d] that there have been multiple times where she will suddenly find herself standing and she is not aware of how she got there or what she was doing."  *Id.*  By May 28, 2020, Plaintiff reported "multiple seizures with loss of consciousness, anywhere from 1–4 seizures a month[,]" since the previous November.  *Id.* at 399, 403.  Plaintiff further reported additional "episodes where she would [feel] a seizure coming on and maybe have a headache but not lose consciousness."  AR at 399, 403.  Plaintiff reported increased anxiety, as well as daily headaches.  *Id.* at 400, 403.  Plaintiff's sister attended the appointment via telephone, and Drs. Labiner and Datta noted that she "[wa]s extremely concerned that her sister is getting worse."  *Id.* at 400, 403.

The ALJ also noted that "[t]here is no recorded recitation of witnessed seizures in the record."  *Id.* at 18.  This statement is incorrect.  On March 2, 2020, Michael Epstein, M.D. evaluated Plaintiff and noted, "[a]n[] auxiliary historian was with [Plaintiff] and said that she could tell when her patient went into a seizure, but there are no clear-cut automatisms, adversive reactions or autonomic changes."  *Id.* at 367.  Defendant discounts this witness statement because "the third party had no apparent observations or details about what a seizure entailed."  Response (Doc. 20) at 11.  The ALJ did not even acknowledge that a witness statement exists, let alone fault it for not being clear enough.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 (9th Cir. 2009) (citations omitted) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ–not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.").  Accordingly, there is evidence in the medical records that Plaintiff's seizures have been witnessed.

Finally, the ALJ found Plaintiff's response "in June 2020 that she was having 4-5 seizures a month, lasting 5-10 minutes each" inconsistent with her statement to "her doctor

that she was having 1-4 seizures per month in May 2020[.]" AR at 19 (citations omitted). This difference does not constitute an inconsistency, especially where her medical records consistently delineate Plaintiff's varying levels of seizure activity.  Substantial evidence does not support the ALJ's finding.

The Court is also concerned regarding a potential language barrier.  At the administrative hearing, Plaintiff's counsel informed the ALJ that although Plaintiff "speaks very good English[,] [h]er native language is Lebanese Arabic." *Id.* at 65.  Counsel further noted that "[t]here may be sometimes when she needs further clarification, but I think she'll be okay in English today."  *Id.*  Generally, Plaintiff did not appear to have difficulty communicating at the hearing; however, during counsel's inquiry into the number of seizures she experienced in a month, Plaintiff misunderstood the question.  *See id.* at 75. Counsel attempted to rephrase his question, but it remains unclear whether she fully understood despite her response.  *See id.*  Furthermore, Plaintiff's self-completion of the Seizure Questionnaire to Third Party suggests a misunderstanding regarding to whom the form was directed.  This occurred prior to her current counsel's involvement in the case.

The Court finds that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which is supported by substantial evidence in the record.  *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).  The Court further finds that this error was not harmless.

### C.    Listing 11.02

Plaintiff asserts that the ALJ erred in finding that Listing 11.02 was not met because she did not meet the requirement of Listing 11.00.H.2. regarding a detailed third-party description of one of her seizures.  Opening Br. (Doc. 16) at 6.

As noted in Section III.B.2., *supra*, the ALJ did not acknowledge the witness statement provided to Dr. Epstein in March 2020.  The Court declines to make a finding regarding whether this statement is sufficient to meet the Listing 11.02 requirements; however, it will direct the ALJ to reconsider this issue on remand.

### D.    Remand

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."  *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits."  *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy."  *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in assessing Plaintiff's symptom testimony.  Additionally, the Court finds it appropriate to direct the ALJ to reassess whether Plaintiff meets the requirements of Listing 11.02.  These analyses requires reconsideration of all evidence in this case, including any additional evidence that Plaintiff may submit.  As such, the Court recommends remand on an open record.

## IV.    CONCLUSION

Based on the foregoing, the Court finds the ALJ committed legal error in assessing Plaintiff's symptom testimony.  The ALJ also committed error in assessing the evidence relevant to Listing 11.02.  Such error requires reversal and remand, and the Court will direct

reanalysis on an open record.

Accordingly, **IT IS HEREBY ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** for further consideration.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment and close its file in this case.

Dated this 20th day of March, 2024.

Eric J. Markovich
United States Magistrate Judge